[Cite as *Columbia Gas v. Bailey*, 2023-Ohio-1245.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

COLUMBIA GAS OF OHIO, INC.,

    PETITIONER-APPELLANT/         CASE NO. 14-22-13
    CROSS-APPELLEE,

    v.

PATRICK E. BAILEY, ET AL.,           O P I N I O N

    RESPONDENTS-APPELLEES/
    CROSS-APPELLANTS.

COLUMBIA GAS OF OHIO, INC.,

    PETITIONER-APPELLANT/         CASE NO. 14-22-14
    CROSS-APPELLEE,

    v.

DON BAILEY, JR., SUCCESSOR
TRUSTEE OF THE ARNO RENNER
TRUST DATED APRIL 24, 1997, ET AL.,     O P I N I O N

    RESPONDENTS-APPELLEES/
    CROSS-APPELLANTS.

**Appeals from Union County Common Pleas Court**
**Trial Court Nos. 21-CV-0112 and 21-CV-0113**

**Judgments Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision: April 17, 2023**

**APPEARANCES:**

*Adam C. Smith* **for Appellant/Petitioner Columbia Gas of Ohio, Inc.**

*David Watkins* **for Appellees/Cross-Appellants/Respondents**

*Ryan P. Sherman* **for Amici Curiae, Ohio Power Company and AEP Ohio Transmission Co., Inc.**

**ZIMMERMAN, J.**

**{¶1}** Petitioner-appellant/cross-appellee, Columbia Gas of Ohio, Inc. ("Columbia Gas"), appeals the April 26, 2022 judgment of the Union County Court of Common Pleas denying its petitions for the appropriation of easement rights. Respondents-appellees/cross-appellants, Don Bailey, Jr., Successor Trustee of the Arno Renner Trust dated April 24, 1997 ("Don"), Charles Peter Renner ("Renner"), Patrick E. Bailey ("Patrick"), and Whitney Bailey ("Whitney") (collectively, "respondents"), appeal the trial court's determination that an agricultural easement does not prevent Columbia Gas's petitions. For the reasons that follow, affirm in part and reverse in part.

**{¶2}** Much like our previous and similar case, this case involves a dispute involving Columbia Gas over the necessity of easement rights it sought through eminent domain for the construction, operation, and maintenance of a natural-gas pipeline. *See Columbia Gas of Ohio, Inc. v. Phelps Preferred Investments, LLC*, 3d

Case No. 14-22-13 and 14-22-14

Dist. Union No. 14-22-07, 2022-Ohio-2540. However, the main issues in this case is whether Columbia Gas is entitled to a necessity presumption under R.C. 163.09(B)(1) *and* whether respondents' agricultural easement precludes an appropriation of easement rights.

*Background*

**{¶3}** The Arno Renner farm originally comprised 231.25 acres of farmland in Marysville, Ohio (the "protected property"). However, the protected property is encumbered by an agricultural easement (as defined under R.C. 5301.67(C)) granted in favor of the Ohio Department of Agriculture ("ODA"). The easement was filed on August 21, 2003, recorded in Volume 509 of the Official Records at Page 369, in the Union County, Ohio Recorder's Office. Later, the protected property was devised and divided. As a result, Don and Renner became the successive owners of 121 acres of the protected property, while and Patrick and Whitney became the successive owners of 110.25 acres of the protected property.

**{¶4}** Before filing its verified petitions in the trial court, Columbia Gas—a public utility—filed a letter-of-notification application under R.C. 4906.06 with the Ohio Power Siting Board ("OPSB") on December 20, 2019. Importantly, Columbia Gas sought approval from the OPSB under R.C. 4906.03(F)(3) since it intended to construct a new natural-gas pipeline which would be greater than one-mile length but not greater than five miles in length. Specifically, Columbia Gas sought the

OPSB's approval to construct a natural-gas pipeline that is approximately 4.78 miles in length, consisting of a 12-inch diameter "coated steel pipe with a wall thickness of 0.375 inches," and "a Maximum Allowable Operating Pressure ("MAOP") of 190 pounds per square inch gauge * * * ." (Petitioner's Ex. 1).

{¶5} In its application, Columbia Gas generally represented to the OPSB that it had "not obtained any easements along the right-of-way" under the section of its application discussing the "list of properties for which the applicant ha[d] obtained easements * * * necessary to construct and operate the facility and a list of the additional properties for which such agreements have not been obtained." (*Id.*). Nevertheless, Columbia Gas indicated that it was "working to obtain easements from the individuals and entities" identified in the appendix and that it would "not begin construction until all easements [were] secured." (*Id.*). Significantly, Columbia Gas's application did not include any further information regarding the specific easements it sought from the landowners in that section or in the corresponding appendix.

{¶6} However, in the general information portion of the application, Columbia Gas informed the OPSB that "[t]he majority of the 12-inch natural gas main will be constructed within permanent private pipeline easements * * * as depicted in the construction plans in Appendix B." (*Id.*). Further, Columbia Gas indicated to the OPSB that "the proposed pipeline route will only include a 75-foot

wide (50-foot permanent easement and 25-foot temporary easement) construction footprint" in the section of its application discussing the impact to wetlands. (*Id.*).

**{¶7}** In its July 9, 2020 staff report of investigation, the OPSB documented that the pipeline project "crosses a parcel protected by an agricultural easement with the [ODA]." (Doc. No. 1, Ex. 3). However, the report reflects the findings that "[t]he easement held by ODA states that it does not preclude installation over or under the protected property for the purpose of providing gas" and that "[f]arming activities would be able to resume within the pipeline easement following completion of construction." (*Id.*).

**{¶8}** Ultimately, on August 27, 2020, the OPSB concluded that Columbia Gas's letter-of-notification application satisfied the requirements enumerated under R.C. 4906.10. Notably, the OPSB concluded that "Columbia [Gas] has demonstrated the basis of need for the Project" since "the Marysville area requires additional demand for natural gas and that the proposed Project, especially when connected to Columbia's Columbus Northern Loop system, will provide an additional supply of natural gas." (Case No. 21CV0112, Doc. No. 1, Ex. 17); (Case No. 21CV0113, Doc. No. 1, Ex. 17).

**{¶9}** Furthermore, the OPSB concluded (based on the findings contained within its staff report of investigation) that "[l]and use throughout the Project area consists primarily of agricultural uses" and that "[t]he Project also crosses an

agricultural easement held by the [ODA]; however, the easement does not preclude installation over or under the property for purposes of providing gas. Farming activities can resume within the Project easement following completion of construction." (*Id.*); (*Id.*).

**{¶10}** As a result, the OPSB (conditionally) issued a certificate under R.C. Chapter 4906 to Columbia Gas. Following the conditional approval of its certificate, Columbia Gas sought to appropriate the necessary easement rights from the respondents.

**{¶11}** However, when negotiations with the respondents failed, Columbia Gas, filed a verified petition for the appropriation of easement rights in real property on July 22, 2021 in the Union County Court of Common Pleas against Patrick, Whitney, and the ODA (in case number 21CV0112) and a petition against Don, Renner, and the ODA (in case number 21CV0113).

**{¶12}** In its petitions, Columbia Gas attached the specific easements rights that it sought from the respondents in relation to its pipeline project. In particular, the easements granted Columbia Gas a "permanent-easement area" "located within the limits of a fifty foot (50') wide easement * * * as shown on Exhibit B attached * * * and made part" of the easement. (Case No. 21CV0112, Doc. No. 1, Ex. 18); (Case No. 21CV0113, Doc. No. 1, Ex. 18). Similarly, the easements granted Columbia Gas a "temporary-easement area"

> to temporarily use an additional twenty-five feet (25') of space adjoining said Permanent Easement Area * * * , as shown on Exhibit B, only for the purpose of enabling [Columbia Gas] to initially construct the pipeline and to later alter, replace, and repair said pipeline and to conduct all activities incident [to], including restoration or clean-up activities.

(*Id.*); (*Id.*). Significantly, Exhibit B depicts a "gas pipeline easement to [Columbia Gas]" and a "25' *perpetual* temporary easement." (Emphasis added.) (*Id.*); (*Id.*).

{¶13} The ODA filed its answers to Columbia Gas's petitions on September 27, 2021. Patrick and Whitney filed their answer to Columbia Gas's petition on October 1, 2021. Don and Renner filed their answer to Columbia Gas's petition on October 5, 2021.

{¶14} On October 22, 2021, the respondents filed motions for a hearing under R.C. 163.09. Because the ODA did "not interpret the proposed utility easement as violating the existing agricultural easement," it filed a motion on November 10, 2021 requesting to be excused from the appropriation-necessity hearing. (Case No. 21CV0112, Doc. No. 31); (Case No. 21CV0113, Doc. No. 31). As evidence in support of its motion, the ODA submitted the affidavit of Sarah Huffman ("Huffman"), the executive director of the Office of Farmland Preservation for the ODA. In the affidavit, Huffman averred that "[a]ccording to Provision 7.1 of the Agricultural Easement," the ODA "has the sole and exclusive discretion to enforce the terms of the Agricultural Easement." (*Id.*); (*Id.*). Based on that determination, Huffman further averred that the

> ODA has determined in its sole and exclusive discretion that the utility easement as proposed by Columbia Gas does not violate the terms of the Agricultural Easement. This is based on correspondence from Melissa Thompson [("Thompson")], Director of Regulatory Policy at Columbia Gas, dated February 24, 2020 * * * . Further, the proposed utility easements attached to the Petitions are consistent with this correspondence.

(*Id.*); (*Id.*). Patrick and Whitney as well as Don and Renner filed memoranda in opposition to the ODA's motion, respectively, on November 15, 2021. However, the trial court granted the ODA's motion that same day.

{¶15} On November 12, 2021, Columbia Gas filed a motion in both cases to strike "the affirmative defenses raised by" the respondents, arguing they are improper necessity challenges. The respondents filed memoranda in opposition to Columbia Gas's motion to strike on November 16, 18, 23, and 24, 2021. On November 30, 2021, Columbia Gas filed its replies to the respondents' memoranda in opposition to its motions to strike.

{¶16} The trial court held necessity hearings on November 17, 2021 and February 22 and 25, 2022, at which Columbia Gas presented the testimony of four witnesses: Thompson; Matthew Opfer ("Opfer"), the manager of major projects for NiSource; Huffman; and Tiffany Fritchley ("Fritchley"), a natural resources permitting coordinator for Columbia Gas and NiSource.

{¶17} In response, the respondents presented the testimony of five witnesses: Ryan Conklin ("Conklin"), an attorney retained to represent the respondents in

negotiations with Columbia Gas regarding the easement rights sought by Columbia Gas; Patrick; Fred Dailey ("Dailey"), Director of the ODA from 1991-2007; Patrick Hornschemeier ("Hornschemeier"), an expert in conservation easements; and Mark Wilson ("Wilson"), an expert agronomist.

{¶18} On November 17, 2021, Thompson identified Columbia Gas's letter-of-notification application (filed with the OPSB) and testified that it reflects that

> the proposed need of the project is to increase economic development and service reliability near Marysville in Union County and the project will, also, provide natural gas service to new industry and residential development near the project alignment and provide existing customers an increased capacity for reliable natural gas service.

(Nov. 17, 2021 Tr. at 34).

{¶19} Thompson explained Columbia Gas's approach to acquiring the easement rights needed for the project from the respondents. According to Thompson, Columbia Gas is generally "seeking the right to construct, operate and maintain the pipeline." (*Id.* at 55-56). She also testified that the specific easement terms include "the right to lay a pipeline subservice on the premise" and "[t]he right to operate and maintain without restriction limitation, repair and replace a pipeline without interruption to service together with necessary valves and other necessary appurtenances." (*Id.* at 56). Furthermore, Thompson testified that Exhibit B to Columbia Gas's letter-of-notification application depicts the permanent and temporary easements.

{¶20} Moreover, Thompson testified that the specific easement rights that Columbia Gas sought from the respondents in relation to its pipeline project "provide for a permanent 50 foot wide easement and a 25 foot temporary easement * * * ." (*Id.* at 58). Thompson acknowledged the categorization of the "temporary perpetual easement" and described such easement as "necessary when Columbia [Gas] is doing its initial construction of the pipeline, as well as any future repairs or maintenance on the pipeline that require that kind of extra space for its equipment." (*Id.*). She further described that Columbia Gas "does not plan to utilize or permanently encumber that 25 foot easement, * * * every day[, u]nlike a permanent easement where Columbia [Gas] is laying a pipeline it will be permanently encumbering that easement area." (*Id.*). In sum, she clarified that the temporary easement is "characterized as perpetual" because it grants Columbia Gas "the ability * * * to utilize it when it needs it for various specific activities" as described in the easement. (*Id.* at 59).

{¶21} On cross-examination, Thompson acknowledged that the easements do not place restrictions on the size of the pipeline that may be installed or as to the type of material that may be transmitted through the pipeline. Moreover, Thompson agreed that the temporary easements do not include any temporal limitation. Further, Thompson testified that the purpose of the temporary easement is the initial

construction and the maintenance of the pipeline, which is also the basis of the permanent easement.

**{¶22}** Opfer testified that, in his role for NiSource, he is responsible for ensuring the execution of the pipeline project at issue in this case. As relevant here, he testified that the permanent and temporary easements are necessary because that is the area required "to safely and efficiently construct the pipeline and then properly maintain and operate it moving forward." (*Id.* at 81). He further described (using technical detail) why such easements are necessary for the construction and maintenance of the pipeline.

**{¶23}** On February 22, 2022, Dailey testified regarding the importance of preserving farmland in Ohio for the public benefit and highlighted that "agriculture is the largest industry in Ohio." (Feb. 22, 2022, Vol. I, Tr. at 106). Importantly, Dailey identified Union, County as situated in "the most productive ground on this earth." (*Id.*). Further, he provided the trial court with an overview of his work as the former director of the ODA in establishing the ODA's Office of Farmland Preservation from which Ohio's agricultural-easement program evolved.

**{¶24}** Critically, Dailey identified Respondents' Exhibit N as the ODA's Office of Farmland Preservation, Ohio Agricultural Easement Donation Program Guidelines that he helped codify in 2006. Dailey testified that the guidelines restrict that

[t]here cannot be any third party interest in the land that are not conducive to agriculture as determined by the Director of ODA. Examples of such interest would be surface mining leases, water, sewer, utility lines or roads and highways outside of existing right-of-ways or other development activities that would damage the topsoil or subsoil of the farm.

(*Id.* at 112). Dailey testified that the current version of the guidelines contains the same restriction. (*See* Respondents' Ex. O). According to Dailey, the installation of Columbia Gas's pipeline project does not comply with the ODA's guidelines.

**{¶25}** Regarding the agricultural easement at issue in this case, Dailey testified that he acknowledged the agricultural deed as the grantee in his capacity as the director of the ODA. Relevantly, the agricultural easement provides that the "protected property" "consists of land devoted exclusively to agricultural use as defined by [R.C. 5713.30] and that it is valued for real property taxation at its current value for agricultural uses under [R.C. 5713.31] or that it constitutes a homestead" and that the grantor "has an interest in preserving the property for agricultural use." (Respondents' Ex. H). Further, the agricultural easement critically imparts that the grantee—the ODA—"is authorized [under R.C. 901.21] to hold agricultural easements * * * for the *public purpose* of retaining the Protected Property predominantly in agriculture." (Emphasis added.) (*Id.*).

**{¶26}** Moreover, paragraph E of the agricultural easement describes Ohio's agricultural-conservation policy (which is consistent with the Federal Farmland Protection Act) and provides that "Ohio has a clearly delineated conservation policy

-12-

to preserve and promote agriculture and agricultural land for a significant public benefit" and that the ODA "is charged with the responsibility of protecting and promoting agriculture, including the preservation of Ohio's farmland by accepting agricultural easements [under R.C. 901.21(B)]." (*Id.*).

{¶27} Importantly, the agricultural easement's statement of purpose reflects that "[i]t is the purpose of this Easement to assure that the Protected Property will be retained predominantly in agricultural use by preserving and protecting its agricultural soils and viability through a perpetual restriction on the use of the Protected Property." (*Id.*). The agricultural easement also lists "prohibited uses/restrictions" as including "any activity on or use of the Protected Property inconsistent with the purposes of this easement is prohibited" and that

> [t]he following activities are expressly prohibited, except as provided in Paragraph 4 below:
>
> 3.1 <u>Industrial or Commercial Activity</u> – There shall be no industrial or commercial activity undertaken or allowed on the Protected Property, except as provided in Paragraph 4 below. No right of passage shall be granted or retained across or upon the Protected Property if that right of passage is used in conjunction with such prohibited activities.
>
> 3.2 <u>Structures</u> – There shall be no new structures or placing of any * * * fence or sign (other than those signs permitted, required or allowed by the Grantee for appropriate management, prevention of hunting or trespass, etc.), asphalt, concrete pavement, * * * utility pole, * * * conduit line, or any other temporary or permanent structure or facility on the Protected Property, except as provided in Paragraph 4 below.
>
> * * *

3.5 <u>Topography</u> – There shall be no ditching; draining; diking; filling; excavating; removal of topsoil, sand, gravel, rock, or other materials; or any change in the topography of the land in any manner, unless in accordance with the farm conservation plan referenced in Paragraph C above.

* * *

3.8 <u>Roads</u> – There shall be no building of new roads, parking lots, or other paved surfaces, or the widening of existing such surfaces, except on the Farmstead Area, state or local highway rights-of-way * * * , and those improvements permitted under Paragraph 4.11 below.

(Emphasis sic.)  (*Id.*).

**{¶28}** Paragraph 4 addresses the rights reserved for the grantor.  As relevant

here, Paragraph 4.10 highlights "utility services" and provides that the

"[i]nstallation, maintenance, repair, replacement, removal and relocation of electric, gas, geothermal, water facilities, sewer lines and/or other public or private utilities * * * over or under the Protected Property for the purpose of providing electrical, gas, water, sewer, or other utilities to serve improvements permitted herein, and the right to grant easements over and under the Protected Property for such purposes, is permitted *without* permission of the Grantee.

(Emphasis added.)   (*Id.*).   Further, Paragraph 4.11 discusses "paving and road

construction" and provides, in its relevant part, that "[c]onstruction of new roads,

parking lots, or other paved surfaces, or the widening of such surfaces, are permitted

outside the Farmstead Area consistent with the agricultural purposes of this

Easement with the advance written permission of the Grantee" but that "[t]he

Grantee shall not give such permission, unless the Grantee determines that the

proposed paving or covering of the soil, or the location of any such road, will not substantially diminish the agricultural values of the Protected Property." (*Id.*).

**{¶29}** Paragraph 7 of the agricultural easement discusses the grantee's enforcement rights and remedies. It provides, in its relevant part, that "the Grantee shall have the following rights and remedies" "[i]n order to enforce the terms of this Easement." (*Id.*).

> 7.1 <u>Remedies</u> – The Grantee shall have the right to enforce by proceedings at law or in equity the provisions of this Easement including, but not limited to, the right to require the restoration of the Protected Property to its condition at the date of the grant of this Easement, subject to the reserved rights of the Grantor set forth herein.

(Emphasis sic.) (*Id.*). Importantly, that paragraph also commands that "[t]he Grantee, or its successors or assigns, *shall not waive or forfeit the right* to take action as may be necessary to ensure compliance with the terms and conditions of this Easement by any prior failures to act." (Emphasis added.) (*Id.*). It continues by requiring "the Grantor [to] notify Grantee of any occurrence which would adversely affect or interfere with the agricultural purposes of the Easement, whether caused by the acts or omissions of the Grantor or *third parties*, or by natural occurrences." (Emphasis added.) (*Id.*).

**{¶30}** To extinguish the agricultural easement, paragraph 13 provides, in its relevant part, that,

> [s]hould the Director of the [ODA], at the request of the *Grantor*, determine that conditions surrounding the Protected Property have

changed so much that it becomes impossible or impractical to fulfill the agricultural purpose of this Easement, then the Grantee may extinguish or modify this Easement, or, extinguishment of the easement may occur in whole or in party by judicial proceeding under applicable local, state, or federal laws.

(Emphasis added.) (*Id.*). Similarly, Paragraph 16 requires that the grantee obtain the "*written consent of the Grantor*" to amend the easement. (Emphasis added.) (*Id.*). That paragraph further *requires* any "such amendment [to be] consistent with the 'Statement of Purpose' of this Easement"; "with the Grantee's Easement amendment policies," "with Section 170(h) of the U.S. Internal Revenue Code or any regulations promulgated in accordance with that section"; and to "be consistent with Section 5301.67 et. seq., of the Ohio Revised Code or any regulations promulgated pursuant to those laws." (*Id.*). Finally, paragraph 22 of the agricultural easement provides that it "may not be changed, modified or discharged except by a writing signed by the duly authorized representatives of *both* the Grantor and the Grantee." (Emphasis added.) (*Id.*).

{¶31} Based on the language contained in the agricultural easement, Dailey testified that the installation of the pipeline would not be consistent with preserving and protecting the viability of the protected property's soils. Dailey also testified that the installation of the pipeline would be inconsistent with Paragraphs 3.1 (restricting industrial or commercial activity); 3.2 (restricting the construction of new structures); and 3.5 (restricting disturbing the topography) of the agricultural

easement. By way of historical example, Dailey testified that the City of Marysville approached the ODA in 2005 (when he was the director of the agency) regarding installing a sanitary-sewer line on the protected property and that the project was denied as being "inconsistent with the easement." (Feb. 22, 2022 Tr., Vol. I, at 120). (*See also* Respondents' Ex. I).

**{¶32}** Moreover, Dailey testified that Huffman's affidavit averring "that the utility easement * * * does not violate the terms of the Agricultural Easement" "looks incestuous" because Huffman's determination—as opposed to consulting an outside, independent source—relies on Columbia Gas's conclusion that its project is consistent with a predominantly agricultural purpose. (Feb. 22, 2022 Tr., Vol. I, at 118). Significantly, Dailey testified that Columbia Gas's intended use of the property will not be predominately agricultural because there will be "changes to the topsoil and substrata" and because it will alter the agricultural "use of this ground." (*Id.* at 119). Notably, Dailey testified that Columbia Gas's proposed use for the protected property will destroy the current public benefit provided by the agricultural easement.

**{¶33}** On cross-examination, Dailey testified that the ODA's easement-donation-program guidelines permit extinguishment of an agricultural easement through eminent domain. However, Dailey clarified that the guidelines state that

"the procedure for extinguishment on account of changed conditions always begins with a request from the landowner to the Director of ODA." (*Id.* at 134).

**{¶34}** Wilson testified, based on his specific experience with the construction and installation of pipelines in the ground on agricultural land, that the protected property's designation as prime farmland "would be forever lost" as a result of Columbia Gas's pipeline project. (Feb. 22, 2022, Tr., Vol. II, at 179). He explained that prime farmland is defined by the Department of Agriculture as "the land that can provide the greatest crop return with the least amount of inputs" and "as the most productive land [because] it has unique properties that insure [sic] a stable food supply." (*Id.* at 165). Furthermore, Wilson testified that "[p]rime farmland insures [sic] a public good" because "[i]t insures [sic] that we have a food supply that keeps up with the growing population * * * ." (*Id.* at 166).

**{¶35}** Critically, Wilson testified that he studied the soil contained on the protected property—namely, in the area of the easement rights sought by Columbia Gas—and testified that it reflects the types of soils which qualify as "prime farmland" because "[t]hey are highly productive soils" and "are desirable to be farmed and they are valuable from that standpoint." (*Id.* at 172). (*See also* Respondents' Ex. W). In other words, Wilson testified that the open-ditch excavation of Columbia Gas's pipeline project will disturb the soil structure and composition of the protected property.

-18-

{¶36} Specifically, he testified that "[t]he process of excavating soil * * * would use a very large excavator and in doing so, you disturb and damage the entire soil profile by pulling it out and placing it in a pile" and "in that process, you would have mixing of * * * horizons." (Feb. 22, 2022, Tr., Vol. II, at 174). Importantly, Wilson testified that, "even after every precaution is taken by Columbia Gas" there would be some mixing of the soil horizons" as a result of construction of the pipeline.

{¶37} Wilson described a soil horizon as "a distinct arrangement of soil in layers," which "are parallel to the soil surface and contain unique properties." (*Id.* at 172). For illustration purposes, he analogized that

> a good way to think of soil horizons is like a cake. On the top of the cake, [is] the A horizon or the top horizon. That's the best soil. The best stuff for producing crops.
>
> Following the next layer in the cake, you would have the B horizon. The B horizon is known as the subsoil. The subsoil does support crop growth and it is important. However, it's not as vital to crop productivity as the topsoil. * * *
>
> Then the bottom of the cake is known as the C horizon. * * * The C horizon is referred to as the substratum [or] the parent material. * * * It's the material that is breaking down, resulting in soil * * * .

(*Id.* at 172-173).

{¶38} Similarly, Wilson testified that the pipeline project will compress the soil through a process known as compaction. He described that compaction "eliminate[s] an ability of the soil to exchange air and have water infiltrate and

percolate through the * * * soil profile" and that "compaction is detrimental." (*Id.* at 175). Likewise, Wilson described the dynamic and inherent properties of soil. As relevant here, he testified that "[t]hose dynamic properties, once they are changed, it is possible over a long period of time to make adjustments and change those," but that "[t]he inherent properties, once those are changed," they "are irreversible." (*Id.* at 178-179).

{¶39} Moreover, Wilson testified that he reviewed Columbia Gas's Agricultural Impact Mitigation Plan. (*See* Petitioner's Ex. 33). Critically, Wilson testified that "[m]itigation means to make less severe," "it does not mean to eliminate." (Feb. 22, 2022, Tr., Vol. II, at 183). Based on his review of the plan, Wilson testified that "much of the language refers to, if it's convenient, if it's possible, [Columbia Gas] will do such a thing." (*Id.* at 184). He further highlighted some of the troubling procedures. In sum, he testified that the document "falls far short of the specifics needed" and that "there's a lot of room for improvement." (*Id.* at 185).

{¶40} On cross-examination, Wilson testified that, even if the protected property is no longer considered prime farmland, it still could be used for crop production after the installation of the pipeline.

{¶41} Because the petitioners objected to the presentation of Hornschemeier's testimony under Evid.R. 702, the respondents proffered that

Hornschemeier would have testified to "the significance of" "Section D of the Ag Easement related to Section 170 of the IRS Code." (*Id.* at 212). Specifically, Hornschemeier would have applied his knowledge and experience to offer the trial court his opinion on the significance of the intersection of the federal tax code and the requirement that the protected property remain "exclusively for the 'conservation purpose' as the term is described in Section 170(H)(4)(A)(III) of the Internal Revenue Code." (Respondents' Ex. H).

{¶42} Likewise, the respondents proffered that Hornschemeier would have testified that the agricultural easement does not permit construction of the pipeline and would have testified that Huffman's assessment is incorrect. Importantly, the respondents proffered that Hornschemeier would have testified that "the preservation of farmland is a public benefit" and that "the installation of the gas pipeline on the protected property would alter or destroy the public benefit provided by the Ag Easement." (Feb. 22, 2022 Tr., Vol. II, at 214).

{¶43} On February 25, 2022, Huffman testified that she is responsible for overseeing management of the ODA's agricultural-easement program, including entering and enforcing such easements. Pertinently, Huffman testified that the Revised Code distinguishes between an agricultural easement and a conservation easement. She indicated that, under the statute, the ODA is permitted to hold only agricultural easements. Regarding her position with the ODA, Huffman testified

that the ODA has adopted a position of "non-interference" with utility installation through farmland, similar to the pipeline project at issue in this case. (Feb. 25, 2022 Tr. at 17-18).

**{¶44}** Huffman identified that the purpose of the agricultural easement at issue in this case is "to assure that the protected property shall be retained predominately in agricultural use by preserving and protecting its agricultural soils and viability." (*Id.* at 10). According to Huffman, the term "predominately in agricultural" means that the protected property "has to be primarily an agricultural use. It can't be converted acres and that can't be converted alternative uses that aren't agriculture" and that such provision applies to the entire property. (*Id.*).

**{¶45}** Moreover, Huffman testified that the section of the agricultural easement describing prohibited uses of the property applies only to the landowner—that is, not the ODA—and prohibits only such uses that are "inconsistent with maintaining the property in predominantly agricultural use." (*Id.* at 11). According to Huffman, the landowners do not have the power to enforce the agricultural easement at issue in this case.

**{¶46}** Huffman further testified that she received correspondence from the respondents requesting that the ODA enforce the agricultural easement at issue in this case. In response, Huffman contacted Columbia Gas requesting an evaluation of its project. Huffman testified that she received a response from Thompson

indicating that Columbia Gas's intended use of the protected property is consistent with the ODA's purpose of preserving "Ohio land to remain predominately agricultural." (Petitioner's Ex. 28). As a result, Huffman testified that, after reviewing Columbia Gas's proposal and Thompson's correspondence, the ODA did "not believe the pipeline violates the purpose of the easement nor the terms." (Feb. 25, 2022 Tr. at 24). (*See also* Petitioner's Ex. 30). Huffman further testified that she offered "experts from [ODA's] soil and water * * * to review the easement * * * and insure [sic] that there were acceptable standards that would return the property to use" "if the [OPSB] were to approve the project." (Feb. 25, 2022 Tr. at 25).

{¶47} On cross-examination, Huffman testified that she did not review Columbia Gas's proposed easements (as attached to its petitions) when she issued her opinion that its project does not violate the purpose of the agricultural easement at issue in this case. Further, Huffman testified that "[t]he protected property cannot be retained predominately in agriculture if its soils are not preserved and protected." (*Id.* at 55).

{¶48} Moreover, Huffman testified that the ODA's role on the OPSB is "to represent agricultural interests and ag impact of projects" but that it recused itself from participating in the OPSB's decision in this case.[1]   (Feb. 25, 2022 Tr. at 67).

---

[1] The director of the ODA is a voting member of the OPSB. In this case, Dorothy Pelanda ("Pelanda"), the (former) director of the ODA designated Huffman to serve as her representative on the OPSB. However, the ODA recused itself from participating in matters relating to Columbia Gas's pipeline project.

Nevertheless, Huffman testified that the OPSB *incorrectly* concluded in its certificate (and staff report of investigation) that the agricultural easement "does not preclude installation over or under the property to provide gas * * * ." (*Id.* at 61).

**{¶49}** Furthermore, Huffman testified regarding the denial of the 2005 sanitary-sewer project. She identified Petitioner's Exhibit 22 as a June 10, 2005 letter from the Union Soil and Water Conservation District expressing "conflicts" between the project and the agricultural easement. (*Id.* at 62). Huffman agreed that such concerns also apply to Columbia Gas's project. Likewise, Huffman identified Petitioner's Exhibit 23 as a September 28, 2005 letter from the Ohio Department of Natural Resources expressing concerns that the sanitary-soil project will destroy the soil structure, lead to compaction, and provoke surface and subsurface drainage issues on the protected property. Notably, the letter directs the reader to the Agricultural Mitigation Procedures promulgated by the Ohio Federation of Soil and Water Conservation Districts and suggests that such minimization techniques be followed. (*See* Respondents' Ex. AE). Huffman testified that she is not aware if Columbia Gas is following such mitigation procedures in this case.

**{¶50}** Fritchley testified that Columbia Gas's pipeline will be installed through open-trench cutting. According to Fritchley, Columbia Gas is required to comply with a Storm Water Prevention Plan ("SWPP") through the Ohio Environmental Protection Agency ("Ohio EPA"). A SWPP through the Ohio EPA

discusses soil-segregation techniques; soil-compaction and decompaction techniques; soil-restoration techniques; soil-erosion prevention; and crop restoration. Fritchley testified that the Ohio EPA issued Columbia Gas a general permit for its pipeline project, including approval of its SWPP. Fritchley identified Columbia Gas's Agricultural Impact Mitigation Plan for the pipeline project and discussed its contents. (*See* Petitioner's Ex. 33).

{¶51} On cross-examination, Fritchley testified that even though the mitigation plan states that it "it is intended to become a part of the * * * easement agreement," it was *not* made part of either easement in this case. (*Id.*). Further, Fritchley testified that she is not an agronomist (or a soils expert).

{¶52} After the necessity hearings, the trial court permitted the parties to submit briefs and proposed findings of fact and conclusions of law, which the parties submitted. On April 26, 2022, the trial court denied Columbia Gas's petitions for the appropriation of the respondents' easement rights. (Case No. 21CV0112, Doc. No. 63); (Case No. 21CV0113, Doc. No. 58). Further, the trial court determined that the agricultural easement does not prevent Columbia Gas's petitions.

{¶53} Columbia Gas filed its notices of appeal on May 18, 2022 in both cases. The respondents filed notices of cross-appeal on May 20, 2022. This court consolidated the cases for purposes of appeal. Columbia Gas raises six assignments of error, and the respondents raise two assignments of for our review. For ease of

our discussion, we will begin by discussing Columbia Gas's first, second, third, fourth, and sixth assignments of error, along with the respondents' first assignment of error. Then, we will discuss Columbia Gas's fifth assignment of error and respondents' second assignment of error together.

### Columbia Gas's Assignment of Error No. I

**The Trial Court erred in holding a hearing (the "Hearing") pursuant to R.C. 163.09(B) because Appellees/Respondents Don Bailey, Jr., Successor Trustee of the Arno Renner Trust dated April 24, 1997 ("Bailey, Jr."), Charles Peter Renner ("Renner"), Patrick Bailey ("P. Bailey"), and Whitney Bailey ("W. Bailey") (collectively, "Appellees") failed to assert specific denials under R.C. 163.08 and instead asserted Affirmative Defenses which cannot trigger a necessity challenge under R.C. 163.09(B)(1).**

### Columbia Gas's Assignment of Error No. II

**The Trial Court erred in finding in the Judgment Entry on Necessity Hearing (the "Judgment Entry") that Appellant/Petitioner Columbia Gas of Ohio, Inc. ("Columbia Gas") is not entitled to an irrebuttable presumption of necessity pursuant to R.C. 163.09(B)(1)(c), despite the Ohio Power Sitting Board ("OPSB") approving Columbia Gas' Letter of Notification Application ("Application" or "OPSB Application") for the Marysville Connector Pipeline Project (the "Project"), which contained the easement terms Columbia Gas seeks to appropriate.**

### Columbia Gas's Assignment of Error No. III

**The Trial Court erred in failing to find in the Judgment Entry that Columbia Gas is entitled to a rebuttable presumption of necessity pursuant to R.C. 163.09(B)(1)(b), despite Columbia Gas presenting evidence of necessity of the appropriation, despite considerable deference afforded to an appropriating public utility, and despite Appellees' failure to overcome Columbia Gas' presumption of necessity of the appropriation.**

**Columbia Gas's Assignment of Error No. IV**

**The Trial Court erred in finding in favor of Appellees in the Judgment Entry on Appellees' Affirmative Defense set forth in Paragraph 18 of Appellees' Answers that the OPSB did not approve the particular easements that Columbia Gas seeks to acquire and that the OPSB did not find that the easements were necessary.**

**Columbia Gas's Assignment of Error No. VI**

**The Trial Court erred by dismissing Columbia Gas' Petition in the Judgment Entry and by failing to hold a compensation hearing pursuant to R.C. 163.09(B)(2), regardless of how the Trial Court ruled on Appellees' Affirmative Defenses.**

**Respondents' Assignment of Error No. I**

**The Trial Court erred by ruling that the Appellant/Cross Appellee/Petitioner had a right to appropriate the property of the Appellees/Cross Appellants/Respondents.**

{¶54} In its assignments of error, Columbia Gas argues that the trial court erred by denying its verified petitions for the appropriation of easement rights in real property. In particular, under its first assignment of error, Columbia Gas argues that the trial court erred by setting the matters for a necessity hearing because the respondents "failed to assert a single specific denial pursuant to R.C. 163.08." (Appellant's/Cross-Appellee's Brief at 8).

{¶55} Under its second and third assignments of error, Columbia Gas contends that it is entitled to the irrebuttable presumption under R.C. 163.09(B)(1)(c) or the rebuttable presumption under 163.09(B)(1)(b). Similarly, it

argues under its fourth assignment of error that the trial court failed to review the specific easement rights that Columbia Gas sought from the respondents. Finally, under its sixth assignment of error, Columbia Gas argues that this court should the remand the cases to the trial court for compensation hearings under R.C. 163.09(B)(2).

**{¶56}** The respondents, in their first assignment of error, argue that the trial court should have applied Ohio's prior public use doctrine to conclude that the specific easement rights sought by Columbia Gas in these cases are not authorized as a result of the agricultural easement.

*Standard of Review*

**{¶57}** "The scrutiny by the courts in appropriation cases is limited in scope," but "requires vigilance in reviewing state actions for the necessary restraint, including review to ensure that the state takes no more than that necessary to promote the public use, and that the state proceeds fairly and effectuates takings without bad faith, pretext, discrimination, or improper purpose." *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, ¶ 69-70. *See also State ex rel. Ohio History Connection v. Moundbuilders Country Club Co.*, 5th Dist. Licking No. 2019 CA 00039, 2020-Ohio-276, ¶ 35 ("The question of necessity is subjected on appeal to a 'limited standard of review.'"), quoting *Willoughby Hills v. Andolsek*, 11th Dist. Lake No. 2001-L-173, 2003-Ohio-323, ¶ 92.

{¶58} Because municipalities "enjoy broad discretion in determining whether a proposed taking serves the public," a trial court's review of a *municipality's* appropriation decision consists of whether "the legislature's exercise of power is not beyond the scope of its authority, and that the power is not abused by irregular or oppressive use, or use[d] in bad faith." *Norwood* at ¶ 70. *See also Ohio Power Co. v. Burns*, ___ Ohio St.3d ___, 2022-Ohio-4713, ¶ 32; *United States v. Carmack*, 329 U.S. 230, 243, 67 S.Ct. 252 (1946) (applying an ultra-vires as well as an arbitrary, capricious, and bad-faith standard of review to takings challenges). Generally, an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). *See also Bd. of Commrs. Mill Creek Park Metro. Dist. v. Less*, 7th Dist. Mahoning No. 20MA0074, 2022-Ohio-1289, ¶ 19 (applying the abuse-of-discretion standard to an R.C. Chapter 163 appropriation case).

{¶59} "However, 'when the authority is delegated to another,'" it is the duty of the trial court to "'ensure that the grant of authority is construed strictly and that any doubt over the propriety of the taking is resolved in favor of the *property owner*.'" (Emphasis added.) *Less* at ¶ 16, quoting *Norwood* at ¶ 70.

{¶60} When a trial court's decision regarding a petition for appropriation rights brought under R.C. Chapter 163 is "'supported by some competent, credible evidence going to all the essential elements of the case[, it] will not be reversed by

-29-

a reviewing court as being against the manifest weight of the evidence.'" *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. *See also Ohio Power* at ¶ 35 (applying the civil-manifest-weight standard of review to a petition for appropriation rights brought under R.C. Chapter 163); *Willoughby Hills*, 2003-Ohio-323, at ¶ 91. In other words, "a trial court's findings of fact will be upheld when they are supported by some competent and credible evidence." *Ohio Power* at ¶ 35. *See also Dublin v. Beatley*, 5th Dist. Delaware No. 18 CAE 01 0007, 2018-Ohio-3354, ¶ 15 (reviewing a trial court's appropriations-rights decision against the competent-credible-evidence standard in an appropriations rights case brought under R.C. Chapter 163).

*Analysis*

{¶**61**} "The property rights of an individual are fundamental rights, and 'the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces.'" *Ohio Power* at ¶ 22, quoting *Norwood* at ¶ 38. However, "[l]ike the individual's right to property, the state's great power to seize private property predates modern constitutional principles." *Norwood* at ¶ 39. Indeed, "[a]t the time the Constitution was adopted, * * * [t]he founders recognized the necessity of the takings power and expressly incorporated it into the Fifth Amendment to the United States Constitution." *Id.* Nevertheless, even "though its existence is undeniable and its powers are sweepingly broad, the power is *not* unlimited." (Emphasis added.) *Id.*

{¶**62**} R.C. Chapter 163 governs the appropriation of private property for public use in Ohio. Importantly, the Revised Code directs that "[n]o agency shall appropriate real property except as necessary and for a public use" and that "[i]n any appropriation, the taking agency shall show by a preponderance of the evidence that the taking is necessary and for a public use."[2] R.C. 163.021(A). *See also Ohio*

---

[2] Under R.C. Chapter 163, an agency "means any public agency or private agency." R.C. 163.01(C). *See also* R.C. 163.01(G) (defining public utility as including "an agency holding a certificate of public convenience and necessity granted by the federal energy regulatory commission). A private agency is "any corporation, firm, partnership, voluntary association, joint-stock association, or company that is not a public agency and that is authorized by law to appropriate property in the courts of this state." R.C. 163.01(B).

*Power* at ¶ 22 (noting that "[t]he state, however, may seize private property when it is necessary for public use."), citing *Norwood* at ¶ 39, 41. "This provision enforces our state constitution's requirement * * * ." *State ex rel. Ohio History Connection v. Moundbuilders Country Club Co.*, ___ Ohio St.3d ___, 2022-Ohio-4345, ¶ 41. *See* Ohio Constitution, Article I, Section 19.

{¶63} Importantly, the Supreme Court of Ohio stresses that "the term 'appropriation' means the appropriation of the specific property sought to be appropriated by the agency; it does not mean the *project* or the *taking in general*, given the restrictions on an agency's right to appropriate." (Emphasis added.) *Ohio Power* at ¶ 24. Consequently,

> R.C. 163.09(B)(1) comes into play only when (1) the agency has filed a petition under R.C. 163.05 against a landowner to appropriate a "parcel or contiguous parcels in a single common ownership, or interest or right therein," and (2) the landowner has filed an answer in response to that petition denying the "necessity for the appropriation" under R.C. 163.08.

*Id.*, citing R.C. 163.09(B)(1). If in play, R.C. 163.09(B)(1) requires the trial court to set a hearing to address the appropriation. *See id.* at ¶ 25 (noting that the trial "court must resolve the agency's right to make the appropriation and the necessity of the appropriation"), citing R.C. 163.08.

*Columbia Gas's Appeal*

{¶64} In this case, Columbia Gas filed its petitions under R.C. 163.05 against the respondents and the respondents filed their answers in response to those petitions

denying the necessity for the appropriations under R.C. 163.08. Nevertheless, Columbia Gas argues under its first assignment of error that the trial court erred by setting the matter for a hearing because the respondents "failed to assert a single specific denial pursuant to R.C. 163.08." (Appellant's/Cross-Appellee's Brief at 8). Instead, Columbia Gas contends that the respondents asserted affirmative defenses under Civ.R. 8(C), which "are not specific denials under R.C. 163.08, * * * and cannot trigger a R.C. 163.09(B) hearing." (Emphasis sic.). (*Id.*). Therefore, Columbia Gas asserts that the trial court should have resolved "any issue that could have been raised through a specific denial by [the respondents] in favor of Columbia Gas." (*Id.*).

**{¶65}** Columbia Gas's argument is without merit. R.C. 163.08 provides, in its relevant part that

> [s]uch answer * * * shall contain a general denial or specific denial of each material allegation not admitted. The agency's right to make the appropriation, the inability of the parties to agree, and the necessity for the appropriation shall be resolved by the court in favor of the agency unless such matters are specifically denied in the answer and the facts relied upon in support of such denial are set forth therein * * * .

**{¶66}** Here, the respondents' answers reflect general and specific denials of each material allegation not admitted. Even though the respondents included a section of specific denials titled "affirmative defenses," under which they listed the specific reasons Columbia Gas's appropriations are not necessary, such

characterization is not fatal to their answers. Indeed, a review of the respondents' denials reflects that they are "sufficiently specific and factually supported to have required a necessity hearing." *Ohio River Pipe Line, LLC v. Gutheil*, 144 Ohio App.3d 694, 698 (4th Dist.2001). Thus, Columbia Gas's first assignment of error is overruled.

**{¶67}** Pivoting to the underlying considerations of R.C. Chapter 163, even though "economic factors may be considered in determining whether private property may be appropriated, the fact that the appropriation would provide an economic benefit to the government and community, standing alone, does not satisfy the public-use requirement of Section 19, Article I of the Ohio Constitution." *Norwood*, 110 Ohio St.3d 353, 2006-Ohio-3799, at paragraph one of the syllabus. Nevertheless, the Revised Code defines "public use." "R.C. 163.01(H)(1) first defines 'public use' by negation"—that is, the Revised Code defines that "a '[p]ublic use' does not include any taking that is for conveyance to a private commercial enterprise, for economic development, or solely for the purpose of increasing public revenue, unless the property is conveyed or leased to" "[a] public utility, municipal power agency, or common carrier." *Ohio History Connection*, ___ Ohio St.3d ___, 2022-Ohio-4345, at ¶ 43; R.C. 163.01(H)(1)(a). The parties do not dispute that Columbia Gas is a public utility. Consequently, there is some competent, credible evidence in the record that the appropriations in this case satisfy

the public-use element.  *See, e.g.*, *Sunoco Pipeline L.P. v. Teter*, 7th Dist. Harrison No. 16 HA 0002, 2016-Ohio-7073, ¶ 81.

**{¶68}** Turning to the necessity element, an agency "must show by a preponderance of the evidence that the taking of the property is necessary, unless one of three circumstances in division (a), (b), or (c) [of R.C. 163.09(B)(1)] has occurred."  *Ohio Power*, ___ Ohio St.3d ___, 2022-Ohio-4713, at ¶ 20.  "'The "necessity" required in the exercise of the power of eminent domain does not require a showing of absolute necessity, but includes "that which is reasonably convenient or useful to the public."'" *Ohio Power Co. v. Duff*, 12th Dist. Madison No. CA2020-01-004, 2020-Ohio-4628, ¶ 32, quoting *Ferencz v. Toledo*, 6th Dist. Lucas No. L-87-379, 1988 WL 139615, *3 (Dec. 30, 1988), quoting *Giesy v. Cincinnati, Wilmington, and Zanesville RR. Co.*, 4 Ohio St. 308, 327 (1854).  "Necessity includes present needs as well as future needs." *Erie-Ottawa-Sandusky Regional Airport Auth. v. Orris*, 6th Dist. Ottawa No. 90-OT-039, 1991 WL 254227, *4 (Sept. 13, 1991).

**{¶69}** Under R.C. 163.09(B)(1)(a), an agency "is entitled to a rebuttable presumption of necessity if the [governing board of the agency] declared by resolution 'the necessity for the appropriation.'" *Id.*, quoting R.C. 163.09(B)(1)(a). "Under division (b), [an agency] is entitled to a rebuttable presumption of necessity if it presented 'evidence of the necessity for the appropriation.'" *Id.*, quoting R.C.

163.09(B)(1)(b). Finally, "under division (c), [an agency] is entitled to an irrebuttable presumption of necessity if a state or federal regulatory authority, such as the [OPSB], approved 'of [the] appropriation.'" *Id.*, quoting R.C. 163.09(B)(1)(c). "Thus, to be entitled to any of the presumptions, the relevant entities must determine the necessity of the appropriation." *Id.*

{¶70} Finally, if the trial court determines that the appropriation is not necessary or not for a public use, the court shall award the respondent the full amount of attorney's fees, costs, and expenses. *Id.* at ¶ 26, citing R.C. 163.041.

{¶71} In its second assignment of error, Columbia Gas contends that it is entitled to the irrebuttable presumption of necessity under R.C. 163.09(B)(1)(c) because the OPSB approved its pipeline project. Columbia Gas's argument is unfounded. Indeed, the Supreme Court of Ohio recently determined that an agency is entitled to the irrebutable presumption of necessity under R.C. 163.09(B)(1)(c) if a state or federal regulatory authority, such as the OPSB, approves "appropriation of the individual property, or the interest or right therein, that is sought to be taken by the agency, *not* the project in its entirety." (Emphasis added.) *Id.* at ¶ 28 (holding "that the term 'appropriation' as used in R.C. 163.09(B)(1) means the appropriation of the individual property, or the interest or right therein, that is sought to be taken by the agency, not the project in its entirety").

{¶72} In this case, the trial court concluded that the OPSB "failed to determine if the appropriation was taking only that which was necessary" because it did not "examine the applicable easement documents itself [sic] * * * ." (Case No. 21CV0112, Doc. No. 63); (Case No. 21CV0113, Doc. No. 58). Specifically, the trial court found that "[t]he OPSB approved the project and a 75 foot wide easement over Respondents' properties, but failed to examine the proposed easement." (*Id.*); (*Id.*).

{¶73} We conclude that some competent, credible evidence supports the trial court's determination that Columbia Gas is *not* entitled to the irrebuttable presumption of necessity under R.C. 163.09(B)(1)(c). That is, the record reflects that the OPSB approved Columbia Gas's project as it is *generally* described in its letter-of-notification application. Specifically, under the project-description section, the OPSB illustrated that Columbia Gas sought "certification to build a 4.78-mile long, 12-inch diameter natural gas pipeline, with a maximum allowable operating pressure of 190 pounds per square inch gauge, in Union County." (Case No. 21CV0112, Doc. No. 1, Ex. 17); (Case No. 21CV0113, Doc. No. 1, Ex. 17). The OPSB further illustrated that "[p]ipeline construction will occur within a 75-foot easement, 25-foot of which is temporary, with the remainder being permanent." (*Id.*); (*Id.*). In other words, the record reflects that the OPSB did not approve "the

*specific* property being appropriated by the agency." (Emphasis added.) *Ohio Power* at ¶ 23. *See also id.* at ¶ 29.

**{¶74}** Nonetheless, Columbia Gas argues that "[e]ven if approval of the Project, alone, does not trigger the irrebuttable presumption under R.C. 163.09(B)(1)(c) * * * , the OPSB approved the terms of the easement that Columbia Gas seeks to acquire when it approved the *rights* contained in the easements." (Emphasis sic.) (Appellant's/Cross-Appellee's Brief at 14-15). Stated another way, Columbia Gas contends that the documentation concerning the easements that it sought from the landowners contained in its letter-of-notification application (and as reviewed by the OPSB) is sufficient to trigger the irrebuttable presumption under R.C. 163.09(B)(1)(c). We disagree. The Supreme Court of Ohio unequivocally determined that a state or federal regulatory authority, such as the OPSB, *must* approve the *individual* appropriations to trigger the irrebuttable presumption under R.C. 163.09(B)(1)(c). *Ohio Power* at ¶ 31.

**{¶75}** Importantly, the Supreme Court stressed that "because it may be inconvenient or tedious for [an agency] to obtain the required resolutions or approvals for *each* appropriation to be entitled to a presumption under R.C. 163.09(B)(1)(a) or (c) does not mean that such an interpretation is unreasonable or absurd." (Emphasis added.) *Id.* Consequently, we conclude that, since the OPSB did not review and approve the individual appropriations at issue in this case—i.e.,

the specific proposed easement terms—Columbia Gas is not entitled to the irrebuttable presumption under R.C. 163.09(B)(1)(c). *Id.* at ¶ 2, 31. Accordingly, Columbia Gas's second assignment of error is overruled.

{¶76} Alternatively, Columbia Gas argues under its third assignment of error that it is entitled to the rebuttable presumption under R.C. 163.09(B)(1)(b) since it provided evidence of the necessity for the appropriations. *Accord id.* at ¶ 2, 32. That is, Columbia Gas argues that the trial court should have resolved this case in its favor after determining that "'[t]his project would benefit the community of Marysville and surrounding areas with an increase in available natural gas.'" (Appellant's/Cross-Appellee's Brief at 17, quoting Case No. 21CV0112, Doc. No. 63 and Case No. 21CV0113, Doc. No. 58).

{¶77} In particular, Columbia Gas posits that it presented evidence of the necessity for the appropriations through the OPSB's issuance of the certificate in which the OPSB "found that 'the public interest, convenience, and necessity are served' through construction, operation, and maintenance of the pipeline." (Appellant's/Cross-Appellee's Brief at 17, quoting Petitioner's Ex. 9). Columbia Gas further contends that it presented evidence of the necessity for the appropriations through Opfer's testimony "that a 75'corridor—a 50' permanent easement and a 25' temporary construction easement—is reasonably convenient and useful to the public." (*Id.* at 17-18, citing Nov. 17, 2021 Tr. at 80). Therefore,

Columbia Gas argues that there is some competent, credible evidence in the record supporting that it satisfied its burden to prove that the easement terms were necessary under R.C. 163.09(B)(1)(b). And, to bolster its argument, Columbia Gas advocates that the respondents did not produce any evidence to balance or counter balance that presumption of necessity.

{¶78} "The General Assembly requires an agency to set forth in its verified petition the 'parcel or contiguous parcels in a single common ownership, or interest or right therein,' that it seeks to appropriate." *Ohio Power* at ¶ 34, quoting R.C. 163.05. *See also Ayersville Water & Sewer Dist. v. Geiger*, 3d Dist. Defiance No. 4-11-19, 2012-Ohio-2689, ¶ 69 (discussing that "R.C. 163.05 provides the requirements an agency must meet to commence an appropriation action"). "Thus, the agency must demonstrate the necessity of that appropriation—the need to take the property, or interest or right therein, set forth in its verified petition." *Ohio Power* at ¶ 34. Consequently, in a case in which "the easement terms include various rights that" an agency seeks to take from landowners, "each easement term that is challenged must be reviewed by the trial court." *Id.*

{¶79} Here, even though the trial court determined that the "project would benefit the community of Marysville and surrounding areas with an increase in available natural gas," the trial court nevertheless concluded that "it was 'bad faith' to represent one thing to the [OPSB] and then ask [the trial] Court to approve

something greater" since "the 25foot easement was labeled 'temporary' before the [OPSB] and transformed itself to 'perpetual' before [the trial] Court * * * ." (Case No. 21CV0112, Doc. No. 63); (Case No. 21CV0113, Doc. No. 58). Importantly, the "rebuttable presumption [under R.C. 163.09(B)(1)(b)] gives rise only to a prima facie showing of necessity," it does not shift the ultimate burden of proof from the agency "to the landowners but, rather, it impose[s] on the landowners '"the burden of going forward with evidence to rebut or meet the presumption.'" *Ohio Power* at ¶ 32, quoting *Hoyle v. DTJ Ents., Inc.*, 143 Ohio St.3d 197, 2015-Ohio-843, ¶ 24, quoting Evid.R. 301. The presumption disappears if the landowners produce "evidence that balances or counterbalances the presumption," "and the case must be resolved on the evidence presented under the original burden of proof." *Id.*

**{¶80}** Nevertheless, this case may be resolved on evidence that Columbia Gas acted in bad faith, abused its discretion, or acted with improper purpose to satisfy its burden of proof. *See id. See also Springfield v. Gross*, 164 Ohio App.3d 1, 2005-Ohio-5527, ¶ 12 (2d Dist.) ("'[W]here the appropriating agency has passed a resolution of necessity for the appropriation, the resolution is prima facie evidence of such necessity in the absence of proof showing fraud, bad faith, or abuse of discretion by the agency.'"), quoting *Mentor v. Osborne*, 143 Ohio App.3d 439, 446 (11th Dist.2001). Here, there is some competent, credible evidence supporting the trial court's determination that Columbia Gas acted in bad faith to satisfy its burden

of proving that the taking is necessary. That is, there is some competent, credible evidence in the record supporting the trial court's assessment that since "the 25foot easement was labeled 'temporary' before the [OPSB] and transformed itself to 'perpetual' before this Court," amounted to "bad faith." (Case No. 21CV0112, Doc. No. 63); (Case No. 21CV0113, Doc. No. 58).

**{¶81}** In the context of appropriations, the Ohio Supreme Court recently defined "bad faith" to mean "'[d]ishonesty of belief, purpose, or motive.'" *Ohio History Connection*, ___ Ohio St.3d ___, 2022-Ohio-4345, at ¶ 31, quoting *Black's Law Dictionary* 171 (11th Ed.2019). When considering whether a party acted in bad faith, the court suggested that we consider whether that party "acted reasonably under the circumstances in addition to considering whether it acted honestly." *Id.* at ¶ 32.

**{¶82}** Here, our review of the record reflects that Columbia Gas did not act with full honesty. Specifically, the record reflects that the OPSB (conditionally) issued a certificate under R.C. Chapter 4906 to Columbia Gas after reviewing Columbia Gas's letter-of-notification application. The certificate (conditionally) authorized Columbia Gas to construct, operate, and maintain a 4.78-mile long, 12-inch diameter natural gas pipeline, with a maximum allowable operating pressure of 190 pounds per square inch gauge.

{¶83} Under the project description, the OPSB unequivocally stated that the "[p]ipeline construction will occur within a 75-foot easement, 25-feet of which is *temporary*, with the remainder being permanent." (Emphasis added.) (Petitioner's Ex. 9). *Compare Phelps Preferred Invests.*, 2022-Ohio-2540, at ¶ 36 (taking note of the "the project description portion of the [OPSB's] certificate of approval" for the pipeline project in which Columbia Gas represented that "'Pipeline construction will occur within a 75-foot easement, 25-feet of which is temporary, with the remainder being permanent'" before the OPSB).

{¶84} As evidence for issuance of the certificate, the OPSB relied on Columbia Gas's letter-of-notification application in which it included obtuse information regarding the easements in the relevant sections. Significantly, Columbia Gas did not include any information regarding the specific easements that it sought from the landowners under the section of its application (or corresponding appendix) discussing the "list of properties for which [it] ha[d] obtained easements * * * necessary to construct and operate the facility and [the] list of the additional properties for which such agreements have not been obtained." (Petitioner's Ex. 1).

{¶85} Furthermore, the record reflects that the general-information section of Columbia Gas's application informed the OPSB that "[t]he majority of the 12-inch natural gas main will be constructed within permanent private pipeline easements * * * as depicted in the construction plans in Appendix B." (*Id.*). In

other words, Columbia Gas did not mention the necessity of a temporary easement in the general-information section of its application. However, the reader must look to Appendix B of the application to learn of Columbia Gas's full intention to construct the pipeline using a permanent *and* temporary easement. Yet, a review of Appendix B reflects that Columbia Gas characterized the temporary easement as just that and *not* a perpetual-temporary easement.

{¶86} Nevertheless, Columbia Gas inconspicuously declared that "the proposed pipeline route will only include a 75-foot wide (50-foot permanent easement and 25-foot temporary easement) construction footprint" in the section of its application discussing the impact to *wetlands*. (*Id.*).

{¶87} Notwithstanding the evidence before the OPSB, Columbia Gas attached the specific easement rights that it sought from the respondents in relation to its pipeline project to its petitions filed with the trial court. Importantly, the easements granted Columbia Gas a "temporary-easement area" "to temporarily use an additional twenty-five feet (25') of space adjoining [the] Permanent Easement Area * * * , as shown on Exhibit B, only for the purpose of enabling [Columbia Gas] to initially construct the pipeline and to later alter, replace, and repair said pipeline and to conduct all activities incident [to], including restoration or clean-up activities." (Case No. 21CV0112, Doc. No. 1, Ex. 18); (Case No. 21CV0113, Doc. No. 1, Ex. 18). Exhibit B depicts a "gas pipeline easement to [Columbia Gas]" and

a "25' *perpetual* temporary easement." (Emphasis added.) (*Id.*); (*Id.*). *Compare Phelps Preferred Invests.*, 2022-Ohio-2540, at ¶ 36 (acknowledging the transformation of the temporary easement from its application before the OPSB to "a 'perpetual temporary easement' at the necessity hearing," and finding significance that "the proposed easement * * * had no expiration date").

{¶88} During the necessity hearing, Columbia Gas presented the testimony of Thompson, who acknowledged the categorization of the "temporary perpetual easement" and described such easement as "necessary when Columbia [Gas] is doing its initial construction of the pipeline, as well as any future repairs or maintenance on the pipeline that require that kind of extra space for its equipment." (Nov. 17, 2021 Tr. at 58). She further described that Columbia Gas "does not plan to utilize or permanently encumber that 25 foot easement, * * * every day [u]nlike a permanent easement where Columbia [Gas] is laying a pipeline it will be permanently encumbering that easement area." (*Id.*). Rather, she testified that the (temporary) easement is "characterized as perpetual" because it grants Columbia Gas "the ability * * * to utilize it when it needs it for various specific activities" as described in the easements. (*Id.* at 59). On cross-examination, Thompson testified that the temporary easement does not include any temporal limitation. She further testified that the purpose of the temporary easement is the initial construction and the maintenance of the pipeline, which is also the basis of the permanent easement.

{¶89} Consequently, contrary to Columbia Gas's argument under its fourth assignment of error, it is evident that the trial court not only reviewed the specific easement rights that Columbia Gas sought from the respondents but concluded that Columbia Gas acted in bad faith to satisfy its burden of proving that the taking is necessary. Therefore, the trial court's determination that Columbia Gas is not entitled to the rebuttable presumption under R.C. 163.09(B)(1)(b) is supported by some competent, credible evidence. *See Phelps Preferred Invests.* at ¶ 36 (concluding that Columbia Gas's "reliance upon testimony to indicate that the 75-foot corridor—a 50-foot permanent easement area and 25-foot temporary perpetual construction easement area * * * is factually inconsistent"). *See also id.* at ¶ 37. For these reasons, Columbia Gas's third and fourth assignments of error are overruled.

{¶90} Finally, Columbia Gas's argument under its sixth assignment of error advocating for this court to remand the cases to the trial court for compensation hearings under R.C. 163.09(B)(2) is without merit. *Accord Phelps Preferred Invests*. at ¶ 43. Indeed, under R.C. 163.09(B)(2), "if the landowner appeals from a necessity determination, the trial court's ability to hold a compensation trial is extinguished until the appeal is decided." *State ex rel. Bohlen v. Halliday*, 164 Ohio St.3d 121, 2021-Ohio-194, ¶ 17. Therefore, Columbia Gas's sixth assignment of error is overruled.

*Respondents' Cross-Appeal*

{¶91} Regardless of any presumption applied to Columbia Gas's petitions, the respondents contend under their first assignment of error that they are entitled to judgment in their favor as a matter of law because Columbia Gas's appropriation of the specific easement rights in these cases is not authorized as a result of the agricultural easement. Specifically, the respondents argue that "the express terms of the Ag Easement prohibit the installation of the Columbia Gas pipeline on the [protected] Property." (Appellee's/Cross-Appellant's Brief at 25).

{¶92} "An easement is a non-possessory property interest in the land of another." *Pomante v. Marathon Ashland Pipe Line, LLC*, 187 Ohio App.3d 731, 2010-Ohio-1823, ¶ 7 (10th Dist.). "An easement 'entitles the owner of the easement, the dominant estate, to a limited use of the land in which the interest exists, the servient estate.'" *Tower 10, LLC v. 10 W Broad Owner, LLC*, 10th Dist. Franklin No. 18AP-998, 2020-Ohio-3554, ¶ 27, quoting *Crane Hollow, Inc. v. Marathon Ashland Pipe Line, L.L.C.*, 138 Ohio App.3d 57, 66 (4th Dist.2000). Easements are either appurtenant or in gross. *Id.* "An easement appurtenant runs with the land and is transferable to future buyers," while an "easement in gross is personal only to the grantee and, therefore does not run with the land." *Id.*, quoting *Walbridge v. Carroll*, 172 Ohio App.3d 429, 2007-Ohio-3586, ¶ 17 (6th Dist.).

**{¶93}** "Easements may be created by grant, implication, prescription, or estoppel." *Id.* at ¶ 28. "'When an easement is created by express grant, the extent and limitations of the easement depend upon the language of the grant.'" *Id.*, quoting *Pomante* at ¶ 7. "'There are no particular words required to create an easement by express grant, provided that the intent of the parties is clear from the document.'" *Id.*, quoting *Cincinnati Entertainment Assocs., Ltd. v. Bd. of Commrs.*, 141 Ohio App.3d 803, 813 (1st Dist.2001).

**{¶94}** "When an easement is set forth in a written agreement, it is subject to the rules of contract law." *Zagrans v. Elek*, 9th Dist. Lorain No. 08CA009472, 2009-Ohio-2942, ¶ 9. "When the terms of an easement 'are clear and unambiguous, the construction of an express easement presents an issue of law.'" *Tower 10* at ¶ 29, quoting *Pomante* at ¶ 7. In that case, we apply a de novo standard of review. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 38, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25.

**{¶95}** "'If there is no specific delineation of the easement, or if the document is ambiguous, the court must then look to the circumstances surrounding the transaction in order to determine the intent of the parties.'" *Tower 10* at ¶ 29,

quoting *Delaware Golf Club, LLC v. Dornoch Estates Homeowners Assn.*, 5th Dist. Delaware No. 19 CAE 04 0027, 2020-Ohio-880, ¶ 43, citing *Hemmelgarn v. Huelskamp & Sons, Inc.*, 3d Dist. Shelby No. 17-19-07, 2019-Ohio-5298, ¶ 13 (addressing that "if there is no specific delineation of the easement, or if the document is ambiguous, then the court must look to the surrounding circumstances in order to determine the intent of the parties"). An easement "is ambiguous if it is 'susceptible to more than one reasonable interpretation.'" *Westlake v. VWS, Inc.*, 8th Dist. Cuyahoga No. 100180, 2014-Ohio-1833, ¶ 34, quoting *Michael A. Gerard, Inc. v. Haffke*, 8th Dist. Cuyahoga No. 98488, 2013-Ohio-168, ¶ 11. Because the intent of the parties becomes a question of fact when a court finds an ambiguity in the easement language, the trier of fact may rely on extrinsic evidence to ascertain such intent. *See Mulchin v. ZZZ Anesthesia, Inc.*, 6th Dist. Erie No. E-05-045, 2006-Ohio-5773, ¶ 36.

**{¶96}** A conservation or agricultural easement must be liberally construed in favor of the underlying intention for the easement as well as the policy and purpose of Sections 5301.67 through 5301.70 of the Revised Code. *Taylor v. Taylor*, 12th Dist. Butler No. CA2017-05-061, 2018-Ohio-1571, ¶ 27. *See also Beaumont v. FirstEnergy Corp.*, 11th Dist. Geauga No. 2004-G-2573, 2004-Ohio-5295, ¶ 18 ("Since an easement is set forth in a written agreement, it must be interpreted in the

identical manner as any other legal contract; i.e., the primary goal in construing the terms of an easement is to ascertain and enforce the intent of the parties.").

{¶97} Decisively, the respondents argue that the agricultural easement restricts the construction of the pipeline project by means of the "[t]he prior public use doctrine." (Appellee's/Cross-Appellant's Brief at 26). That is, the respondents advocate that the "doctrine prohibits the taking [of the respondents' property] because of the prior public use in place under the Ag Easement to perpetually preserve agricultural lands through the preservation and protection of soils for the full range of agricultural activities available under law, as defined by R.C. §5713.30 * * * ." (*Id.*).

> {¶98} Ohio's prior public use doctrine provides
>
> that when a condemner, to which the power of eminent domain is given by law, seeks to exercise its power with respect to property already devoted to public use, its action may be enjoined if the proposed use will either destroy the existing use or interfere with it to such an extent as is tantamount to destruction, unless the law has authorized the acquisition either expressly or by necessary implication.

*Blue Ash v. Cincinnati*, 173 Ohio St. 345, 351 (1962). *See also Worthington v. Columbus*, 100 Ohio St.3d 103, 2003-Ohio-5099, ¶ 19 (addressing "that the prior public use doctrine arose as the result of interpretation of statutes vesting municipalities and other public entities with the power of eminent domain"). Moreover, "[t]he manner in which the property was originally acquired has no

bearing upon the operation of the general rule." *Blue Ash* at 351. "[D]efining the parameters of the power of eminent domain is a judicial function." *Worthington* at ¶ 21.

**{¶99}** The respondents argue that "[t]he preservation of farmland and agricultural soils is a public use" and that "the agricultural easement is a statement of a public use that existed prior to the attempt to appropriate the" protected property in this case. (Appellee's/Cross-Appellant's Brief at 26). By way of historical timeline, the respondents illustrate that the State of Ohio codified "the 'Clean Ohio' amendment to the Ohio Constitution" in 2000 for the "'conservation and preservation of * * * farmlands and other lands devoted to agriculture, including by acquiring land or interests therein * * * ." (*Id.* at 26-27, quoting Ohio Constitution, Article VIII, Section 2o(A)(1)). Therefore, the respondents contend that the protected property is already devoted to public use under the agricultural easement.

**{¶100}** In Ohio, "R.C. 5301.67 through R.C. 5301.70 govern the creation, ownership and enforcement of conservation" and agricultural easements. *Lightle v. Washington Court House*, 12th Dist. Fayette No. CA2006-08-033, 2007-Ohio-2069, ¶ 12. An

> "agricultural easement" means an incorporeal right or interest in land that is held for the *public purpose* of retaining the use of land predominantly in agriculture; that imposes any limitations on the use or development of the land that are appropriate at the time of creation of the easement to achieve that purpose; that is in the form of articles of dedication, easement, covenant, restriction, or condition; and that

> includes appropriate provisions for the holder to enter the property subject to the easement at reasonable times to ensure compliance with its provisions.

(Emphasis added.) R.C. 5301.67(C). R.C. 5713.30 defines land devoted exclusively to agricultural use. Generally, "land devoted exclusively to agricultural use" means devoting a minimum of ten acres of land for at least one of the purposes described in the statute for the three years prior to an application filed under R.C. 5713.31. R.C. 5713.30(A)(1). An application filed under R.C. 5713.31 generally requests "the auditor to value the land for real property tax purposes at the current value such land has for agricultural use." R.C. 5713.31(A).

{¶101} R.C. 5301.68 permits "[a]n owner of land [to] grant an agricultural easement to the director of agriculture * * * ." Importantly, that landowner "may grant an agricultural easement only on land that is valued for purposes of real property taxation at its current value for agricultural use under section 5713.31 of the Revised Code or that constitutes a homestead when the easement is granted." R.C. 5301.68. R.C. 901.21(B) authorizes the ODA to accept such agricultural easements. That statute provides, in its relevant part that

> [t]he director of agriculture may acquire real property used predominantly in agriculture and agricultural easements by gift, devise, or bequest if, at the time an easement is granted, such an easement is on land that is valued for purposes of real property taxation at its current value for agricultural use under section 5713.31 of the Revised Code or that constitutes a homestead. Any terms may be included in an agricultural easement so acquired that are necessary or appropriate to preserve on behalf of the grantor of the easement the

> favorable tax consequences of the gift, devise, or bequest under the "Internal Revenue Act of 1986," 100 Stat. 2085, 26 U.S.C.A. 1, as amended.

R.C. 901.21(B).

**{¶102}** R.C. 5301.70 advises that "[c]onservation easements are not unenforceable for lack of privity of contract or estate or lack of benefit to a particular dominant estate." Likewise, the statute directs that "[t]he terms of a conservation easement may be enforced by injunction or in any other civil action by the holder of the easement." R.C. 5301.70. *See Zagrans*, 2009-Ohio-2942, at ¶ 9. Even though "conservation easement" and "agricultural easement" are independently defined under the Revised Code, such definitional distinction does not change the enforceability of the agricultural easement in this case.

**{¶103}** Here, the respondents assert that the statutory definition of an agricultural easement necessitates judicial review of the prior public use doctrine in this case. That is, because the General Assembly defined an agricultural easement under R.C. 5301.67(C) to mean a right in land that is held for "the public purpose," the respondents insist that they have invoked the prior public use doctrine since there is an agricultural easement encumbering the protected property. Columbia Gas opposes the respondents' argument by advocating that "[a] 'public use' and a 'public purpose' are different things." (Appellant's/Cross-Appellee's Reply Brief at 15). Columbia Gas's argument is a distinction without a difference. Indeed, the

Supreme Court of Ohio uses the phrases synonymously when discussing the prior public use doctrine. *See, e.g.*, *Worthington*, 100 Ohio St.3d 103, 2003-Ohio-5099, at ¶ 23.

{¶104} Our review of the record reflects that the respondents' presented some competent, credible evidence that the protected property is encumbered by a prior public use. That is, the respondents presented evidence that the protected property is encumbered by an agricultural easement (as defined under R.C. 5301.67(C)) granted in favor of the ODA. Specifically, Respondents' Exhibit H reflects that the agricultural easement was filed on August 21, 2003, recorded in Volume 509 of the Official Records at Page 369, in the Union County, Ohio Recorder's Office.

{¶105} Nevertheless, Columbia Gas seeks to exercise its power as a public utility to appropriate the protected property. The Supreme Court of Ohio unequivocally held that such "taking may be enjoined if it will result in the destruction of an existing public use." *Northwood v. Wood Cty. Regional Water & Sewer Dist.*, 86 Ohio St.3d 92, 95 (1999). That is, "[t]he Ohio Constitution does not expressly or by necessary implication authorize a city [or agency] to take property already used for public purposes in order to further a proprietary function * * * ." *Worthington*, 100 Ohio St.3d 103, 2003-Ohio-5009, at ¶ 23. Importantly, the Supreme Court of Ohio has not refined the prior public use doctrine to permit the

courts to balance the competing public uses to determine which necessity best serves the public interest. *See id.* at ¶ 27 (Pfeifer, J., dissenting). Accordingly, to overcome application of the prior public use doctrine, Columbia Gas must present evidence to contradict (evidence presented by the respondents) that the proposed pipeline project will destroy the existing public use of the protected property. *Accord id.* (holding that "Worthington did not contradict evidence proffered by Columbus that its proposed use of the subject property as a cemetery would destroy the existing public use of the land as an open-space park").

{¶106} Even though "there is abundant evidence in the record, we are loath to make a factual determination, especially in the first instance" since the trial court did not resolve this issue. *Northwood* at 95. Accordingly, we reverse the trial court's determination that the agricultural "easement prevents eminent domain in this action" and remand the matters to the trial court to determine whether Columbia Gas's proposed easement will destroy the existing public use of the protected property. (Case No. 21CV0112, Doc. No. 63); (Case No. 21CV0113, Doc. No. 58).; *Northwood* at 95 ("Accordingly, we reverse the judgment of the court of appeals and remand to the trial court to review the current record to determine whether the proposed taking will result in the destruction of the district."). That is, we remand these cases to the trial court to determine whether Columbia Gas presented evidence contradicting the evidence presented by the respondents that Columbia Gas's

proposed use will destroy the existing public use of the protected property. Based on the foregoing, the respondents' first assignment of error is sustained.

## Columbia Gas's Assignment of Error No. V

**The Trial Court erred by admitting into evidence at the Haring settlement discussions regarding the terms of the easements before the underlying appropriation cases were filed because such settlement discussions constitute compromise negotiations and are inadmissible under Rule 408 of the Ohio Rules of Evidence.**

## Respondents' Assignment of Error No. II

**The Trial Court erred by not allowing the testimony of Appellees/Cross Appellants/Respondents'' expert witness, Patrick Hornschemeier.**

{¶107} Under its fifth assignment of error, Columbia Gas contends that the trial court abused its discretion by admitting Conklin's testimony because it constituted compromise negotiations. Similarly, under their second assignment of error, the respondents argue that the trial court abused its discretion by excluding Hornschemeier's testimony.

### *Standard of Review*

{¶108} An appellate court reviews decisions involving the admissibility of evidence for an abuse of discretion. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, ¶ 22. *See also Akron Bar Assn. v. Shenise*, 143 Ohio St.3d 134, 2015-Ohio-1548, ¶ 13 ("We review a decision on the admission or exclusion of expert witness testimony under an abuse-of-discretion standard."). As

we previously stated, an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

*Analysis*

**{¶109}** We will begin by addressing Columbia Gas's argument that the trial court abused its discretion by admitting Conklin's testimony. Specifically, Columbia Gas contends that Conklin's testimony should have been excluded because "[c]ompromise negotiations between an appropriating entity and a landowner concerning land rights before an appropriation action is filed * * * are inadmissible as a matter of law pursuant to Evid.R. 408." (Appellant's/Cross-Appellee's Brief at 22). Therefore, Columbia Gas asserts that the trial court abused its discretion by admitting Conklin's testimony "regarding his pre-suit negotiations with Columbia Gas for the land rights sought by Columbia gas and Appellees' proposed revisions to the easements." (*Id.*).

Evid.R. 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue

delay, or proving an effort to obstruct a criminal investigation or prosecution.

*See also Toledo v. Bernard Ross Family Ltd. Partnership*, 165 Ohio App.3d 557, 2006-Ohio-117, ¶ 64 (6th Dist.) ("Evid.R. 408 prohibits introduction of evidence regarding settlement or compromise that is offered 'to prove liability for or invalidity of the claim or its amount.'"), quoting Evid.R. 408.

**{¶110}** "Evid.R. 408 does not prohibit all evidence concerning settlement negotiations, as such evidence may be admissible under the relevancy test of Evid.R. 401, to show a witness is biased or to impeach a witness." *M.M. v. V.S.*, 6th Dist. Lucas No. L-21-1176, 2022-Ohio-1531, ¶ 28, citing *Kane v. Inpatient Med. Services, Inc.*, 9th Dist. Summit No. 29087, 2019-Ohio-1975, ¶ 18. "Where a statement is not made in the context of an offer of compromise, however, it is not granted the protection of the exclusionary rule contained in Evid.R. 408." *USCA/USA, Inc. v. High Tech Packaging, Inc.*, 6th Dist. Wood No. WD-05-088, 2006-Ohio-6195, ¶ 34. "In addition, Evid.R. 408 is applicable only to bar the admission of evidence which is offered to show 'that because a settlement offer was made, the offeror must be liable, because people [do not] offer to pay for things for which they are not liable.'" *Id.*, quoting *Boyle v. Daimler Chrysler Corp.*, 2d Dist. Clark No. 2001-CA-81, 2002-Ohio-4199, ¶ 95. "In other words, Evid.R. 408 does not bar information from settlement negotiations when it is offered for another purpose and not to prove liability against one of the parties to the negotiations." *Id.*

**{¶111}** Here, the trial court did not abuse its discretion by admitting Conklin's testimony regarding his pre-suit negotiations with Columbia Gas in this case. That is, the evidence was not offered for the purpose of establishing liability or the value of any claim. Rather, the respondents offered Conklin's testimony to prove that the specific easement rights sought by Columbia Gas are *not* necessary. Consequently, Conklin's testimony is outside the scope of Evid.R. 408. *See High Tech Packaging* at ¶ 35. Therefore, Columbia Gas's fifth assignment of error is overruled.

**{¶112}** Turning to the respondents' second assignment of error, based on our conclusion as to the applicability of the prior public use doctrine, we conclude that the trial court abused its discretion by excluding Hornschemeier's testimony. Indeed, under their second assignment of error, the respondents argue Hornschemeier's testimony was admissible because he is "an expert in conservation easements, including agricultural easements" and he "would have testified and provided expert opinion on the significance of Federal tax law with regard to the agricultural easement." (Appellee's/Cross-Appellant's Brief at 33). In other words, Hornschemeier would have testified to the intersection of ODA's argument that the protected property will remain "predominately" for agricultural use against the federal tax code's preservation requirements.

{¶113} For a witness to testify as an expert witness under Evid.R. 702, three conditions must be satisfied: (1) his or her testimony must "'relate to matters beyond the knowledge or experience possessed by laypersons; (2) [the witness] must be qualified as an expert by specialized knowledge regarding the subject matter of the testimony; and, (3) [the] testimony must be based on reliable scientific, technical, or other specialized information.'" *Levine v. Kellogg*, 10th Dist. Franklin No. 18AP-694, 2020-Ohio-1246, ¶ 63, quoting *Laketran Bd. of Trustees v. Mentor*, 11th Dist. Lake No. 2001-L-027, 2002-Ohio-3496, ¶ 54, citing Evid.R. 702. Typically, "[e]xpert testimony under Evid.R. 702 'is admissible in the form of an opinion to aid the court in arriving at a correct determination.'" *Id.*, quoting *Copper & Brass Sales, Inc. v. Plating Resources, Inc.*, 9th Dist. Summit No. 15563, 1992 WL 368497, *5 (Dec. 9, 1992). However, "[t]here is no requirement that an expert possess complete knowledge of the field in question but must possess enough knowledge that he or she will aid the trier of fact in performing its fact-finding function." *Id.* at ¶ 52.

{¶114} In response to the respondents' argument, Columbia Gas asserts that the trial court did not abuse its discretion by excluding Hornschemeier's testimony because his "proffered testimony * * * is irrelevant and would have constituted nothing more than an improper legal opinion and conclusion." (Appellant's/Cross-Appellee's Reply Brief at 19). Generally, "'[a]n expert witness is not permitted to

give an opinion relating to the law, and a trial court that allows such an opinion abuses its discretion.'" *Hubbard v. Defiance*, 3d Dist. Defiance No. 4-12-22, 2013-Ohio-2144, ¶ 27, quoting *Witzmann v. Adam*, 2d Dist. Montgomery No. 05-CV-4086, 2011-Ohio-379, ¶ 62. However, that rule applies to jury trials. *See Wizmann* at ¶ 62, citing *Kraynak v. Youngstown City School Dist. Bd. of Edn.*, 118 Ohio St.3d 400, 2008-Ohio-2618, at ¶ 21 (providing that a trial court abuses its discretion when it allows an expert witness to interpret for the jury what a statute requires).

**{¶115}** "[I]n the context of a bench trial, reviewing courts 'afford broad leeway to the trial court in deciding the reliability of particular expert testimony' under Evid.R. 702." *Levine* at ¶ 67, quoting *Knott v. Revolution Software, Inc.*, 181 Ohio App.3d 519, 2009-Ohio-1191, ¶ 46 (5th Dist.). "Further, '"[w]hen a matter is tried before the court in a bench trial, there is a presumption that the trial judge 'considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'"'" *Id.*, quoting *In re Fair*, 11th Dist. Lake No. 2007-L-166, 2009-Ohio-683, ¶ 66, quoting *Jackson v. Herron*, 11th Dist. Lake No. 2003-L-145, 2005-Ohio-4046, ¶ 28, quoting *State v. White*, 15 Ohio St.2d 146, 151 (1968).

**{¶116}** Based on our conclusion that the prior public use doctrine applies to the facts and circumstances of this case (and our decision to remand the matter to the trial court to determine whether Columbia Gas's proposed easement will destroy

the existing public use of the protected property), Hornschemeier's testimony is relevant to whether Columbia Gas's proposed easement will destroy the existing public use of the protected property. Specifically, Hornschemeier's testimony is relevant to ensuring that the parties to the agricultural easement comply with the federal-tax requirements pertaining to the donation of an agricultural easement. His testimony is further relevant to the trial court's consideration of whether Columbia Gas's proposed easement will destroy the existing public use of the protected property. Therefore, the trial court abused its discretion by excluding Hornschemeier's testimony. Consequently, the respondents' second assignment of error is sustained.

{¶117} Having found no error prejudicial to the appellant/cross-appellee herein in the particulars assigned and argued in appellant/cross-appellee's assignments of error, but having found error prejudicial to the appellees/cross-appellants herein in the particular assigned and argued in appellees/cross-appellants' assignments of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**MILLER, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**